UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INTERNATIONAL INC., MTV NETWORKS, a division of Viacom International Inc., COMEDY PARTNERS, BET HOLDINGS LLC, and COUNTRY MUSIC TELEVISION, INC., <br><br> Plaintiffs and Counterclaim-Defendants, <br><br> v. <br><br> TIME WARNER CABLE INC., TIME WARNER ENTERTAINMENT COMPANY L.P., and TIME WARNER CABLE LLC, <br><br> Defendants and Counterclaim-Plaintiffs. | ECF CASE <br><br> Civil Action No. 11-cv-2387 (LBS) <br><br> **ANSWER AND COUNTERCLAIMS** |

## ANSWER

Defendants Time Warner Cable Inc. ("TWC"), Time Warner Entertainment Company L.P., and Time Warner Cable LLC (together the "Defendants"), by and through their undersigned attorneys, submit the following Answer to the Complaint of Plaintiffs Viacom International Inc. ("Viacom"), MTV Networks ("MTVN"), a division of Viacom International Inc., Comedy Partners, BET Holdings LLC ("BET"), and Country Music Television, Inc. ("CMT") (together, the "Plaintiffs").

### NATURE OF THE ACTION

1.     Defendants admit that Plaintiffs purport to bring this action for damages and to enjoin Defendants from distributing certain programming offered by certain of the Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of Paragraph No. 1 of the Complaint.  Defendants deny the remaining allegations in Paragraph No. 1 of the Complaint.

2.     Defendants admit that Plaintiffs' Complaint asserts various causes of action and purports to seek injunctive relief, damages and declaratory relief.  Defendants deny the remaining allegations in Paragraph No. 2 of the Complaint.

3.     Defendants admit that, on March 15, 2011, TWC launched its TWCable TV iPad App, through which TWC makes certain cable programming viewable by its video subscribers on Apple iPad tablet computers within the subscribers' homes ("in-home iPad viewing"); that TWC distributed certain programming for in-home iPad viewing, including programming provided by certain of the Plaintiffs; that, on or around March 15, 2011, TWC temporarily halted distribution of certain programming for in-home iPad viewing, including programming provided by certain of the Plaintiffs; and that, on or around March 31, 2011, TWC ceased distributing certain of the Plaintiffs' programming for in-home iPad viewing.  Defendants deny the remaining allegations in Paragraph No. 3 of the Complaint.

4.     Defendants admit that Plaintiffs purport to bring this action for a declaratory judgment, damages and to enjoin Defendants from distributing certain programming. Defendants deny that any of the Defendants infringed any of the Plaintiffs' copyrights or trademarks, or breached any agreements with Plaintiffs, and deny that Plaintiffs are entitled to injunctive relief, declaratory relief, damages, or any other relief of any kind.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the remainder of Paragraph No. 4 of the Complaint and, therefore, deny the same.

5.     Defendants admit that certain of the Defendants are parties to agreements with certain of the Plaintiffs (collectively, and together with the amendments thereto, the "Viacom Affiliation Agreements"), and refer to the contents of those agreements for the terms thereof, which agreements grant to TWC, *inter alia*, a broad right of carriage to distribute programming

of certain networks owned by Viacom and its affiliates (together, the "Viacom Services"), to TWC video subscribers utilizing TWC's cable system; that TWC or its affiliates provide video, high-speed data, and voice services for which subscribers generally pay monthly fees; and that from March 15, 2011 through and including March 31, 2011, TWC made the Viacom Services available for in-home iPad viewing to certain TWC video subscribers. Defendants deny the remaining allegations in Paragraph No. 5 of the Complaint.

6.    Defendants admit that certain of the Defendants are parties to the Viacom Affiliation Agreements, which agreements grant to TWC, *inter alia*, a broad right of carriage to distribute the Viacom Services to TWC video subscribers utilizing TWC's cable system, and refer to those agreements for the contents thereof. Defendants deny the remaining allegations in Paragraph No. 6 of the Complaint.

7.    Defendants admit that beginning in December 2010, certain of the Plaintiffs objected to in-home iPad viewing and that representatives of certain of the Defendants and certain of the Plaintiffs had discussions and exchanged correspondence in that regard. Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the first sentence, and otherwise deny the remainder of, Paragraph No. 7 of the Complaint.

8.    Defendants admit that, on March 15, 2011, TWC made in-home iPad viewing available to its video subscribers and that the launch was accompanied by announcements regarding in-home iPad viewing. Defendants deny the remaining allegations in Paragraph No. 8 of the Complaint.

9.    Defendants admit they contend that in-home iPad viewing offered to video subscribers is authorized under the Viacom Affiliation Agreements. Defendants also admit that Viacom programming content distributed for in-home iPad viewing does not presently support

parental control, blocking and/or emergency alert features, but deny that this gives rise to any cognizable claim by Plaintiffs. Defendants deny the remaining allegations in Paragraph No. 9 of the Complaint.

10.    Defendants deny the allegations in Paragraph No. 10 of the Complaint.

11.    Defendants admit that Plaintiffs' Complaint purports to seek injunctive relief and damages. Defendants deny the remaining allegations in Paragraph No. 11 of the Complaint.

## JURISDICTION AND VENUE

12.    Defendants admit that pursuant to 28 U.S.C. § 1331, district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" and that pursuant to 28 U.S.C. § 1338(a), district courts have exclusive jurisdiction over "any civil action arising under any Act of Congress relating to . . . copyrights," but deny the remaining allegations in Paragraph No. 12 of the Complaint and further deny that Plaintiffs have any valid claims arising under the Copyright Act.

13.    Defendants admit the allegations in Paragraph No. 13 of the Complaint, but deny that Plaintiffs have any valid claims arising under the Lanham Act.

14.    Defendants deny that Plaintiffs have any valid claims arising under the Copyright Act or the Lanham Act, and therefore deny the allegations in Paragraph No. 14.

15.    Defendants admit the allegations in the first three sentences of Paragraph No. 15 of the Complaint and further admit that Viacom International Inc. and Comedy Partners have their respective principal places of business in New York and in this District. Defendants deny the remaining allegations in Paragraph No. 15 of the Complaint.

16.    Defendants admit the allegations in Paragraph No. 16 of the Complaint.

## THE PARTIES

17.    Defendants admit that Viacom International Inc. is a Delaware corporation with its principal place of business in New York, New York, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 17 of the Complaint and, therefore, deny the same.

18.    Defendants admit the allegations in Paragraph No. 18 of the Complaint.

19.    Defendants admit that Comedy Partners is a general partnership formed in New York with its principal place of business in New York, New York, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 19 of the Complaint and, therefore, deny the same.

20.    Defendants admit that BET Holdings LLC is an affiliate of Viacom Inc. and a successor in interest to Black Entertainment Television, Inc. and is a Delaware limited liability company with its principal place of business in Washington, D.C., but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 20 of the Complaint and, therefore, deny the same.

21.    Defendants admit that Country Music Television, Inc. is a Tennessee corporation with its principal place of business in Nashville, Tennessee, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 21 of the Complaint and, therefore, deny the same.

22.    Defendants admit the allegations in Paragraph No. 22 of the Complaint.

23.    Defendants admit the allegations in Paragraph No. 23 of the Complaint.

24.    Defendants admit the allegations in Paragraph No. 24 of the Complaint.

# FACTS

25.     Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 25 of the Complaint and, therefore, deny the same.

26.     Defendants admit that networks owned or operated by Plaintiffs or their affiliates include *MTV, MTV2, mtvU, MTV Tr3s, VH1, VH1 Classic, CMT, Logo, Nickelodeon/Nick at Nite, Nick Jr., Teen Nick, Nicktoons Networks, BET, Comedy Central, Spike TV,* and *TV Land,* but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 26 of the Complaint and, therefore, deny the same.

27.     Defendants admit that certain of the Plaintiffs make their programming available on cable systems, on satellite television systems, over the public Internet, and by other methods, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 27 of the Complaint and, therefore, deny the same.

28.     Defendants admit that certain of the Plaintiffs make their programming available through certain other outlets, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 28 of the Complaint and, therefore, deny the same.

29.     Defendants admit that certain of the Plaintiffs receive revenues from subscriber fees and from commercial advertising, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 29 of the Complaint and, therefore, deny the same.

30.    Defendants admit that the Nielsen Company or affiliates thereof provide viewership tracking information, obtained in part from electronic tracking devices, to certain programming networks, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 30 of the Complaint and, therefore, deny the same.

31.    Defendants admit the allegations in the fourth sentence of Paragraph No. 31 and refer to the Nielsen 2010 Annual Report for a complete and accurate account of its contents. Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations set forth in Paragraph No. 31 of the Complaint and, therefore, deny the same.

32.    Defendants admit that some cable television advertising arrangements include guarantees to the advertiser, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 32 of the Complaint and, therefore, deny the same.

33.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 33 of the Complaint and, therefore, deny the same.

34.    Defendants admit that, as of the date hereof, the Nielsen Company and its affiliates have not yet publicly introduced systems using electronic tracking devices to monitor in-home iPad viewing on TWC's cable systems, but, upon information and belief, state that Nielsen Company has a solution under development.  Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 34 of the Complaint and, therefore, deny the same.

35.   Defendants admit that video, high-speed data, and voice services are three of the subscription services offered by TWC to its customers; that TWC's website and 2010 Annual Report discuss the provision of these services; and refer to the contents of such website and 2010 Annual Report, respectively, for a complete and accurate account of their contents.  Defendants deny the remaining allegations in Paragraph No. 35 of the Complaint.

36.   Defendants admit that TWC's 2010 Annual Report states that "TWC has approximately 12.3 million residential video subscribers," that, among other things, "TWC's video subscribers pay a fixed monthly fee based on the video programming tier they receive," and otherwise refer to TWC's 2010 Annual Report for a complete and accurate account of its contents.  Defendants deny the remaining allegations in Paragraph No. 36 of the Complaint.

37.   Defendants admit that TWC's 2010 Annual Report states that, "[a]s of December 31, 2010, TWC served approximately 9.5 million residential high-speed data subscribers;" that "[s]ubscribers pay a fixed monthly fee based on the level of service received," and refer to TWC's 2010 Annual Report for a complete and accurate account of its contents.  Defendants deny the remaining allegations in Paragraph No. 37 of the Complaint.

38.   Defendants admit that certain of the Defendants are parties to the Viacom Affiliation Agreements; and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 38 of the Complaint.

39.   Defendants deny the allegations in Paragraph No. 39 of the Complaint.

40.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, including an agreement dated August 10, 2000, with MTV Networks, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 40 of the Complaint.

8

41.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 41 of the Complaint.

42.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 42 of the Complaint.

43.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 43 of the Complaint.

44.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 44 of the Complaint.

45.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 45 of the Complaint.

46.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, including an agreement dated April 23, 2003, with MTV Networks and Comedy Partners, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 46 of the Complaint.

47.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 47 of the Complaint.

48.    Defendants admit that certain of the Defendants entered the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 48 of the Complaint.

49.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 49 of the Complaint.

50.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, including agreements with CMT and with BET and/or affiliates or successors thereof that were subsequently amended; and lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 50 of the Complaint and, therefore, deny the same.

51.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 51 of the Complaint.

52.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 52 of the Complaint.

53.    Defendants admit that Plaintiffs use the term "Agreements" to refer collectively to certain agreements certain of the Defendants entered into with certain of the Plaintiffs and/or successors or affiliates thereof, but aver that certain of those agreements have subsequently been amended and therefore deny that the "Agreements" as defined in Paragraph 53 fully constitute the operative agreements between the parties.  Defendants deny the remaining allegations in Paragraph No. 53 of the Complaint.

54.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements and amendments for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 54 of the Complaint.

55.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements and amendments for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 55 of the Complaint.

56.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 56 of the Complaint.

57.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements and amendments for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 57 of the Complaint.

58.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 58 of the Complaint.

59.     Defendants deny the allegations in Paragraph No. 59 of the Complaint.

60.     Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 60 of the Complaint and, therefore, deny the same.

61.     Defendants admit that Plaintiffs have attached to the Complaint a list of television programs in which certain of the Plaintiffs purport to own copyright interests, but lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the remainder of Paragraph No. 61 of the Complaint and, therefore, deny the same.

62.    Defendants aver that Paragraph No. 62 of the Complaint constitutes a legal conclusion to which no response is required, except admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be Certificates of Registration from the United States Copyright Office, in which certain of the Plaintiffs are identified as the author.

63.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 63 of the Complaint and, therefore, deny the same.

64.    Defendants deny the allegations in Paragraph No. 64 of the Complaint.

65.    Defendants deny the allegations in Paragraph No. 65 of the Complaint.

66.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 66 of the Complaint and, therefore, deny the same.

67.    Defendants admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be service mark registrations from the United States Patent and Trademark Office, in which certain of the Plaintiffs are identified as the owner.  Defendants deny the remaining allegations in Paragraph No. 67 of the Complaint.

68.    Defendants aver that Paragraph No. 68 of the Complaint constitutes a legal conclusion to which no response is required, except admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be service mark registrations from the United States Patent and Trademark Office, in which certain of the Plaintiffs are identified as the owner.

69.    Defendants deny the allegations in Paragraph No. 69 of the Complaint.

70.    Defendants admit that, on March 15, 2011, TWC made in-home iPad viewing, which included the Viacom Services, available to certain video subscribers.  Defendants deny the remaining allegations in Paragraph No. 70 of the Complaint.

71.    Defendants admit that, on March 15, 2011, TWC made in-home iPad viewing, which included the Viacom Services, available to certain video subscribers and that certain of the Plaintiffs expressed objections thereto.  Defendants deny the remaining allegations in Paragraph No. 71 of the Complaint.

72.    Defendants admit that they make certain cable programming viewable by their video subscribers on Apple iPad tablet computers within the subscribers' homes.  Defendants otherwise deny the allegations in Paragraph No. 72 of the Complaint

73.    Defendants deny the allegations in Paragraph No. 73 of the Complaint.

74.    Defendants admit that, on March 15, 2011, counsel for certain of the Plaintiffs sent a letter to TWC, and refer to the contents of the letter; that, on March 15, 2011, TWC made in-home iPad viewing, which included the Viacom Services, available to certain of its video subscribers; that, on or around March 15, 2011, TWC temporarily halted distribution of certain programming for in-home iPad viewing, including the Viacom Services; and that, on or around March 31, 2011, TWC ceased distributing the Viacom Services for in-home iPad viewing.  Defendants deny the remaining allegations in Paragraph No. 74 of the Complaint.

75.    Defendants deny the allegations in Paragraph No. 75 of the Complaint.

76.    Defendants deny the allegations in Paragraph No. 76 of the Complaint.

77.    Defendants deny the allegations in Paragraph No. 77 of the Complaint.

78.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the first and third sentences of Paragraph No. 78 of the

Complaint and, therefore, deny the same.  Defendants deny the remaining allegations in Paragraph No. 78 of the Complaint.

79.    Defendants deny the allegations in Paragraph No. 79 of the Complaint.

80.    Defendants deny the allegations in Paragraph No. 80 of the Complaint.

81.    Defendants admit that, as of the date hereof, the Nielsen Company and its affiliates have not yet publicly introduced systems using electronic tracking devices to monitor in-home iPad viewing on TWC's cable systems, but, upon information and belief, state that Nielsen Company has a solution under development.  Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the first sentence of Paragraph No. 81 of the Complaint and, therefore, deny the same.  Defendants deny the remaining allegations in Paragraph No. 81 of the Complaint.

82.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the first and second sentences of Paragraph No. 82 of the Complaint and, therefore, deny the same.  Defendants deny the remaining allegations in Paragraph No. 82 of the Complaint.

83.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the first and second sentences of Paragraph No. 83 of the Complaint and, therefore, deny the same.  Defendants deny the remaining allegations in Paragraph No. 83 of the Complaint.

84.    Defendants deny the allegations in Paragraph No. 84 of the Complaint.

## CLAIMS FOR RELIEF

### COUNT I

### (Declaratory Judgment)

85.    Defendants repeat and reallege each and every response to paragraphs 1 through 84 of the Complaint above as if fully set forth herein.

86.    Defendants admit that there is an actual case or controversy between certain of the Defendants and certain of the Plaintiffs arising out of the Viacom Affiliation Agreements. Defendants deny the remaining allegations in Paragraph No. 86 of the Complaint.

87.    Defendants deny the allegations in Paragraph No. 87 of the Complaint.

88.    Defendants admit that under the grant of rights in the Viacom Affiliation Agreements, Defendants are authorized to provide services to their video subscribers, including through the TWCable TV iPad App, a "Smart TV" application, and other comparable applications and services that enable subscribers to view video programming distributed on Defendants' cable system on a video display device of their choice in the home; and that, on March 31, 2011, certain of the Defendants issued a press release, and refer to the contents of that press release for the complete terms thereof.  Defendants deny the remaining allegations in Paragraph No. 88 of the Complaint.

89.    Defendants deny the allegations in Paragraph No. 89 of the Complaint.

### COUNT II

### (Breach of Contract - Unauthorized Distribution of MTVN Programming)

90.    Defendants repeat and reallege each and every response to paragraphs 1 through 89 of the Complaint above as if fully set forth herein.

91.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 91 of the Complaint.

92.    Defendants deny the allegations in Paragraph No. 92 of the Complaint.

93.    Defendants deny the allegations in Paragraph No. 93 of the Complaint.

94.    Defendants deny the allegations in Paragraph No. 94 of the Complaint.

95.    Defendants deny the allegations in Paragraph No. 95 of the Complaint.

## COUNT III

**(Breach of Contract - Unauthorized Use of the MTVN Trademarks)**

96.    Defendants repeat and reallege each and every response to paragraphs 1 through 95 of the Complaint above as if fully set forth herein.

97.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 97 of the Complaint.

98.    Defendants deny the allegations in Paragraph No. 98 of the Complaint.

99.    Defendants deny the allegations in Paragraph No. 99 of the Complaint.

100.    Defendants deny the allegations in Paragraph No. 100 of the Complaint.

101.    Defendants deny the allegations in Paragraph No. 101 of the Complaint.

## COUNT IV

**(Breach of Contract - Materially Degrading Quality of MTVN Programming)**

102.    Defendants repeat and reallege each and every response to paragraphs 1 through 101 of the Complaint above as if fully set forth herein.

103.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 103 of the Complaint.

104.    Defendants deny the allegations in Paragraph No. 104 of the Complaint.

105.    Defendants deny the allegations in Paragraph No. 105 of the Complaint.

106.    Defendants deny the allegations in Paragraph No. 106 of the Complaint.

107.    Defendants deny the allegations in Paragraph No. 107 of the Complaint.

## COUNT V

**(Breach of Contract - Unauthorized Distribution of Comedy Central Programming)**

108.    Defendants repeat and reallege each and every response to paragraphs 1 through 107 of the Complaint above as if fully set forth herein.

109.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 109 of the Complaint.

110.    Defendants deny the allegations in Paragraph No. 110 of the Complaint.

111.    Defendants deny the allegations in Paragraph No. 111 of the Complaint.

112.    Defendants deny the allegations in Paragraph No. 112 of the Complaint.

113.    Defendants deny the allegations in Paragraph No. 113 of the Complaint.

## COUNT VI

**(Breach of Contract - Unauthorized Use of the Comedy Partners Trademarks)**

114.    Defendants repeat and reallege each and every response to paragraphs 1 through 113 of the Complaint above as if fully set forth herein.

115.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 115 of the Complaint.

116.    Defendants deny the allegations in Paragraph No. 116 of the Complaint.

117.    Defendants deny the allegations in Paragraph No. 117 of the Complaint.

118.    Defendants deny the allegations in Paragraph No. 118 of the Complaint.

119.    Defendants deny the allegations in Paragraph No. 119 of the Complaint.

## COUNT VII

**(Breach of Contract - Materially Degrading Quality of Comedy Central Programming)**

120.    Defendants repeat and reallege each and every response to paragraphs 1 through 119 of the Complaint above as if fully set forth herein.

121.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 121 of the Complaint.

122.    Defendants deny the allegations in Paragraph No. 122 of the Complaint.

123.    Defendants deny the allegations in Paragraph No. 123 of the Complaint.

124.    Defendants deny the allegations in Paragraph No. 124 of the Complaint.

125.    Defendants deny the allegations in Paragraph No. 125 of the Complaint.

## COUNT VIII

**(Breach of Contract - Unauthorized Distribution of BET Programming)**

126.    Defendants repeat and reallege each and every response to paragraphs 1 through 125 of the Complaint above as if fully set forth herein.

127.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 127 of the Complaint.

128.    Defendants deny the allegations in Paragraph No. 128 of the Complaint.

129.    Defendants deny the allegations in Paragraph No. 129 of the Complaint.

130.    Defendants deny the allegations in Paragraph No. 130 of the Complaint.

131.    Defendants deny the allegations in Paragraph No. 131 of the Complaint.

## COUNT IX

### (Breach of Contract - Unauthorized Use of the BET Trademarks)

132.    Defendants repeat and reallege each and every response to paragraphs 1 through 131 of the Complaint above as if fully set forth herein.

133.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 133 of the Complaint.

134.    Defendants deny the allegations in Paragraph No. 134 of the Complaint.

135.    Defendants deny the allegations in Paragraph No. 135 of the Complaint.

136.    Defendants deny the allegations in Paragraph No. 136 of the Complaint.

137.    Defendants deny the allegations in Paragraph No. 137 of the Complaint.

## COUNT X

### (Breach of Contract - Materially Degrading Quality of BET Programming)

138.    Defendants repeat and reallege each and every response to paragraphs 1 through 137 of the Complaint above as if fully set forth herein.

139.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 139 of the Complaint.

140.    Defendants deny the allegations in Paragraph No. 140 of the Complaint.

141.    Defendants deny the allegations in Paragraph No. 141 of the Complaint.

142.    Defendants deny the allegations in Paragraph No. 142 of the Complaint.

143.    Defendants deny the allegations in Paragraph No. 143 of the Complaint.

## COUNT XI

### (Breach of Contract - Unauthorized Distribution of CMT Programming)

144.    Defendants repeat and reallege each and every response to paragraphs 1 through 143 of the Complaint above as if fully set forth herein.

145.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 145 of the Complaint.

146.    Defendants deny the allegations in Paragraph No. 146 of the Complaint.

147.    Defendants deny the allegations in Paragraph No. 147 of the Complaint.

148.    Defendants deny the allegations in Paragraph No. 148 of the Complaint.

149.    Defendants deny the allegations in Paragraph No. 149 of the Complaint.

## COUNT XII

### (Breach of Contract - Unauthorized Use of the CMT Trademarks)

150.    Defendants repeat and reallege each and every response to paragraphs 1 through 149 of the Complaint above as if fully set forth herein.

151.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 151 of the Complaint.

152.    Defendants deny the allegations in Paragraph No. 152 of the Complaint.

153.    Defendants deny the allegations in Paragraph No. 153 of the Complaint.

154.    Defendants deny the allegations in Paragraph No. 154 of the Complaint.

155.    Defendants deny the allegations in Paragraph No. 155 of the Complaint.

## COUNT XIII

### (Breach of Contract - Materially Degrading Quality of CMT Programming)

156.    Defendants repeat and reallege each and every response to paragraphs 1 through 155 of the Complaint above as if fully set forth herein.

157.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 157 of the Complaint.

158.    Defendants deny the allegations in Paragraph No. 158 of the Complaint.

159.    Defendants deny the allegations in Paragraph No. 159 of the Complaint.

160.    Defendants deny the allegations in Paragraph No. 160 of the Complaint.

161.    Defendants deny the allegations in Paragraph No. 161 of the Complaint.

## COUNT XIV

### (Copyright Infringement – 17 U.S.C. § 501)

162.    Defendants repeat and reallege each and every response to paragraphs 1 through 161 of the Complaint above as if fully set forth herein.

163.    Defendants admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be Certificates of Registration from the United States Copyright Office, in

which certain of the Plaintiffs are identified as the author, but lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the remainder of Paragraph No. 163 of the Complaint and, therefore, deny the same.

164.   Defendants deny the allegations in Paragraph No. 164 of the Complaint.

165.   Defendants deny the allegations in Paragraph No. 165 of the Complaint.

166.   Defendants deny the allegations in Paragraph No. 166 of the Complaint.

167.   Defendants deny the allegations in Paragraph No. 167 of the Complaint.

168.   Defendants deny the allegations in Paragraph No. 168 of the Complaint.

## COUNT XV

### (Trademark Infringement – 15 U.S.C. § 1114)

169.   Defendants repeat and reallege each and every response to paragraphs 1 through 168 of the Complaint above as if fully set forth herein.

170.   Defendants admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be service mark registrations with the United States Patent and Trademark Office, in which certain of the Plaintiffs are identified as the owner, but lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the remainder of Paragraph No. 170 of the Complaint and, therefore, deny the same.

171.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 171 of the Complaint.

172.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to the contents of those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 172 of the Complaint.

173.   Defendants deny the allegations in Paragraph No. 173 of the Complaint.

174.   Defendants deny the allegations in Paragraph No. 174 of the Complaint.

175.   Defendants deny the allegations in Paragraph No. 175 of the Complaint.

176.   Defendants deny the allegations in Paragraph No. 176 of the Complaint.

177.   Defendants deny the allegations in Paragraph No. 177 of the Complaint.

178.   Defendants deny the allegations in Paragraph No. 178 of the Complaint.

179.   Defendants deny the allegations in Paragraph No. 179 of the Complaint.

## COUNT XVI

### (False Designation of Origin – 15 U.S.C. § 1125)

180.   Defendants repeat and reallege each and every response to paragraphs 1 through 179 of the Complaint above as if fully set forth herein.

181.   Defendants deny the allegations in Paragraph No. 181 of the Complaint.

182.   Defendants deny the allegations in Paragraph No. 182 of the Complaint.

183.   Defendants deny the allegations in Paragraph No. 183 of the Complaint.

184.   Defendants deny the allegations in Paragraph No. 184 of the Complaint.

185.   Defendants deny the allegations in Paragraph No. 185 of the Complaint.

186.   Defendants deny the allegations in Paragraph No. 186 of the Complaint.

187.   Defendants deny the allegations in Paragraph No. 187 of the Complaint.

188.   Defendants deny the allegations in Paragraph No. 188 of the Complaint.

## COUNT XVII

### (Common Law Unfair Competition)

189.   Defendants repeat and reallege each and every response to paragraphs 1 through 188 of the Complaint above as if fully set forth herein.

190.   Defendants deny the allegations in Paragraph No. 190 of the Complaint.

191.   Defendants deny the allegations in Paragraph No. 191 of the Complaint.

192.    Defendants deny the allegations in Paragraph No. 192 of the Complaint.

193.    Defendants deny the allegations in Paragraph No. 193 of the Complaint.

## PRAYER FOR RELIEF

Defendants deny any allegations set forth in the "Prayer for Relief" and deny that the Plaintiffs' claims have any basis in fact or law or that Plaintiffs are entitled to any of the relief that they seek.

To the extent a response to any allegation of the Complaint has not been provided in the preceding paragraphs, it is denied.

## <u>AFFIRMATIVE AND OTHER DEFENSES</u>

Defendants allege the following affirmative defenses to the Complaint and in doing so do not concede that they bear the burden of proof or persuasion on any of them:

### FIRST DEFENSE

Plaintiffs fail to state a claim, in whole or in part, upon which relief can be granted.

### SECOND DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrine of unclean hands.

### THIRD DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrines of waiver, laches, and/or estoppel.

### FOURTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by Plaintiffs' failure to suffer any damages.

### FIFTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by Plaintiffs' failure to mitigate any alleged damages.

### SIXTH DEFENSE

Plaintiffs' claims, if any, are barred based on their breach of the Viacom Affiliation Agreements.

### SEVENTH DEFENSE

Plaintiffs' damages, if any, are speculative, and thus are not recoverable.

### EIGHTH DEFENSE

Plaintiffs' damages, if any, are barred in whole or in part by the terms of the Viacom Affiliation Agreements.

### NINTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by Defendants' licenses and other rights set forth in the Viacom Affiliation Agreements.

### TENTH DEFENSE

Plaintiffs' claims, if any, for equitable relief are barred because Plaintiffs have an adequate remedy at law.

### ELEVENTH DEFENSE

Plaintiffs are not entitled to any injunctive or equitable relief because they will not suffer irreparable harm.

### TWELFTH DEFENSE

Plaintiffs' claims, if any, are limited to a contract remedy under the terms of the Viacom Affiliation Agreements that Plaintiffs allege.

### THIRTEENTH DEFENSE

Defendants reserve the right to raise additional affirmative and other defenses as may be established by discovery and the evidence in this proceeding.

### FOURTEENTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrine of misuse of copyright.

### FIFTEENTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrine of fair use.

### COUNTERCLAIMS

Counterclaim-Plaintiffs Time Warner Cable Inc. ("TWC"), Time Warner Entertainment Company L.P., and Time Warner Cable LLC (together the "Counterclaim-Plaintiffs"), by and through their undersigned attorneys, bring these counterclaims against Counterclaim-Defendants Viacom International Inc. ("Viacom"), MTV Networks ("MTVN"), a division of Viacom International Inc., Comedy Partners, BET Holdings LLC ("BET"), and Country Music Television, Inc. ("CMT") (together, the "Counterclaim-Defendants"), and allege as follows:

### NATURE OF THIS ACTION

1.    The Counterclaim-Plaintiffs bring these counterclaims for declaratory judgment to clarify certain rights and obligations under agreements by and between certain of the Counterclaim-Plaintiffs and certain of the Counterclaim-Defendants (together, the "Viacom Affiliation Agreements").

2.    The Viacom Affiliation Agreements grant to the Counterclaim-Plaintiffs a broad right of carriage to distribute programming of certain owned by Viacom and its affiliates (together, the "Viacom Services"), to TWC video subscribers utilizing TWC's cable system. Nonetheless, in clear contravention of the grant of rights in the Viacom Affiliation Agreements, the Counterclaim-Defendants have brought this legal action against the Counterclaim-Plaintiffs for transmitting the Viacom Services to TWC video subscribers who wish to use their iPads in their homes as an additional screen to view their cable service, which includes the Viacom Services.

3.    The Counterclaim-Defendants' suit ignores the uncontestable fact that the Viacom Affiliation Agreements do not in any way limit the types of video display devices upon which TWC video subscribers may view programming provided through TWC's cable system.  The devices subscribers use to view programming in their homes have evolved over time from analog vacuum tube devices to flat screens – both plasma and LCDs – and now Smart TV's and tablets, such as iPads.  In anticipation of the changing marketplace for electronics capable of viewing video programming, the Counterclaim-Plaintiffs intentionally obtained from the Counterclaim-Defendants a grant of broad distribution rights that is silent as to devices – whether the initial receive device (*e.g.*, a set-top box or a cable modem) or the display device (*e.g.*, black and white or color, 21" cathode ray tube TV or 55" flat plasma display or 9" tablet), thereby preserving a subscriber's ability to utilize multiple types and categories of video display devices without restriction, so long as that distribution takes place over TWC's cable system.  The distribution rights also give the Counterclaim-Plaintiffs the flexibility to employ appropriate signal formats and transmission technologies within TWC's cable system that enable its subscribers to use these different video display devices in their homes.

4.     Consistent with its rights under the Viacom Affiliation Agreements, on March 15, 2011, TWC launched its TWCable TV iPad App, through which TWC makes certain cable programming viewable by its video subscribers on Apple iPad tablet computers within the subscribers' homes ("in-home iPad viewing").

5.     TWC distributes the video programming for in-home iPad viewing solely through TWC's existing cable system.  That is, the same "pipe" that delivers video programming to set-top boxes in its subscribers' homes is also used to deliver video programming to the iPad tablet. In many of its subscribers' homes, TWC distributes multiple "simulcast" versions of the same network in different formats so that the network can be received on the various devices in the subscribers' homes:  for example, an analog format version that can be received in the cathode ray tube set in the basement, a standard definition digital version for the digital set in the kitchen, a high definition version for the large flat plasma screen in the family room, and now an IP format version that is compatible with the new generation of "Smart TVs" that combine television and computer capabilities in one device, and with tablets, such as iPads.  In-home iPad viewing simply enables TWC's video subscribers to use the iPad as an additional display device within their homes, allowing them to view on their iPad the programming that they subscribe to and have paid for – and for which TWC has handsomely paid the Counterclaim-Defendants – without the need to obtain another set-top box or television.

6.     Importantly, although the format employed by TWC for distribution to the iPad is commonly referred to as "IP," referring to the "Internet Protocol" format, TWC does not distribute the video programming to the iPad over the public Internet.  Rather, the signal is delivered to a subscriber's iPad through TWC's private and secure cable system.  Subscribers are able to view the programming only in their homes.

7.    TWC video subscribers have in-home iPad viewing access only to those channels for which they have already paid.  TWC takes substantial security measures to prevent unauthorized access to the video programming, and to ensure that all of the users of in-home iPad viewing subscribe to any channel that they watch.

8.    The TWCable TV iPad App is only the latest method provided by TWC to permit its subscribers to watch video programming on a variety of video display devices linked to the TWC cable system.  In 2005, TWC launched an IP-format service in San Diego called "Broadband TV" that, like the TWCable TV iPad App, utilized the TWC cable system to enable subscribers to view licensed video programming on another video display device – in that case a computer screen.  Although Viacom initially sent a cease-and-desist letter to TWC expressing concerns about Broadband TV, after TWC explained that the service was limited to in-home viewing of paid-for programming services over TWC's cable system – not the Internet – Viacom raised no further concerns, and Broadband TV continued under the then-existing agreements with Viacom until Broadband TV was discontinued by TWC in 2007.  Subsequently, in amended agreements for the Viacom Services, Viacom did not seek to describe or limit the types of devices upon which subscribers viewed programming distributed over the TWC cable system.  In fact, Viacom negotiated the Second Amendment Core Services Agreement (defined below), which was finalized in January 2006 and extended the term of the Core Services Agreement (defined below) for another ██ years, *with full knowledge of the then-ongoing provision of Broadband TV*.  All of the Viacom Affiliation Agreements were further extended in January 2009.  Despite its documented complaints regarding Broadband TV, Viacom did not limit the scope of the grant of rights in either of these contractual extensions.

9.    In late 2010 and early 2011, TWC began to preview its development of applications to enable in-home tablet viewing with an announcement by TWC's CEO on December 6, 2010, at the UBS Global Media and Communications Conference, and a public demonstration of what would become in-home iPad viewing, using a tablet device from another consumer electronics manufacturer.  The announcement garnered widespread notice in the trade press.

10.    On December 14, 2010, Sandra Wells, SVP, Business & Legal Affairs at MTV Networks, a division of Viacom, wrote to Michelle Kim, Group Vice President & Chief Counsel, Programming, at TWC regarding TWC's CEO's public statements and unjustifiably stated "our affiliation agreements do not authorize TWC to distribute the MTVN and BETN services to iPads."  On January 18, 2011, Ms. Kim responded to Ms. Wells, stating that the Viacom Affiliation Agreements provide "no limitations on the types of devices to which TWC can distribute your signals and our carriage rights are quite broad . . . ."

11.    On March 15, 2011, TWC launched the TWCable TV iPad App, allowing video subscribers who otherwise already receive cable programming from TWC in their homes to view a selection of that same programming on Apple iPad tablets in their homes.  In-home iPad viewing has proven to be extremely popular with TWC video subscribers.  Between March 15, 2011, when TWC first made in-home iPad viewing available, and June 5, 2011, the TWCable TV iPad Apps had been downloaded over 500,000 times.

12.    Notwithstanding Viacom's assent to TWC's previous Broadband TV service, on March 15, 2011, counsel for Viacom Inc., Peter Zimroth at Arnold & Porter LLP, sent a cease and desist letter to Marc Lawrence-Apfelbaum, EVP and General Counsel at TWC, claiming that "Viacom would consider any launch of an iPad application using its copyrighted content as a

serious and material breach of the Affiliation Agreement and an infringement of its exclusive rights under copyright law."

13.    TWC responded by letter to Viacom's counsel on March 16, 2011, vigorously denying any wrongdoing and explaining to Viacom's counsel why Viacom's legal and factual position was baseless. TWC has at all times acted within its contractual rights under the Viacom Affiliation Agreements, and the Counterclaim-Defendants have not and cannot identify any contractual provisions of the Viacom Affiliation Agreements that are violated by TWC subscribers' use of in-home iPad viewing.

14.    On March 31, 2011, TWC, without prejudice to its rights, removed the Viacom Services from the programming that it offers its subscribers via in-home iPad viewing and replaced those networks with programming from cable programmers that had not objected to iPad viewing of their programming. Because the Counterclaim-Plaintiffs bargained in the Viacom Affiliation Agreements to allow TWC video subscribers the flexibility to receive and watch the programming for which they have paid on any video display device in the home, the Counterclaim-Plaintiffs filed an action in this Court on April 8, 2011 seeking a declaration to make clear that TWC has the right under the Viacom Affiliation Agreements to transmit the Viacom Services to any screen capable of receiving such programming over TWC's cable system. Counterclaim-Plaintiffs assert this counterclaim for the same purpose.

## THE PARTIES

15.    Counterclaim-Plaintiff Time Warner Cable Inc. is a Delaware corporation with its principal office at 60 Columbus Circle, New York, New York 10023. TWC is the second-largest cable television operator in the United States, with more than 14.4 million customers who subscribe to one or more of its video, high-speed data, and voice services.

16.     Counterclaim-Plaintiff Time Warner Cable LLC is a Delaware limited liability company with its principal office at 60 Columbus Circle, New York, New York 10023.

17.     Counterclaim-Plaintiff Time Warner Entertainment Company L.P. is a Delaware limited partnership with its principal office at 60 Columbus Circle, New York, New York 10023.

18.     Counterclaim-Defendant Viacom International Inc. is a Delaware corporation with its principal place of business in New York, New York.  Viacom is a global entertainment content company, providing television programming, motion pictures, and a wide range of digital media.

19.     Counterclaim-Defendant MTV Networks is a division of Viacom International Inc.

20.     Counterclaim-Defendant Comedy Partners, an affiliate of Viacom, is a general partnership formed in New York with its principal place of business in New York, New York.

21.     Counterclaim-Defendant BET Holdings LLC, an affiliate of Viacom, and a successor in interest to Black Entertainment Television, Inc., is a Delaware limited liability company with its principal place of business in Washington, D.C.  Upon information and belief, one or more members of the limited liability company include entities organized under the laws of New York and/or with their principal place of business in New York.

22.     Counterclaim-Defendant Country Music Television, Inc., an affiliate of Viacom, is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

**JURISDICTION AND VENUE**

23.     An actual and justiciable controversy exists between the Counterclaim-Plaintiffs and the Counterclaim-Defendants concerning the non-infringement of the Counterclaim-Defendants' copyrights by the Counterclaim-Plaintiffs and TWC's subscribers by virtue of the Counterclaim-Defendants' allegations of infringement against the Counterclaim-Plaintiffs.

Accordingly, subject matter jurisdiction for this declaratory judgment action is proper in this Court under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

24.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the state claims herein because these claims are related to, and form part of, the same case and controversy as the federal claims herein.

25.     This Court has personal jurisdiction over Counterclaim-Defendant Viacom International Inc. because Viacom International Inc. is principally located in the State of New York and regularly does business in the State of New York and/or by virtue of Viacom International Inc.'s significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

26.     This Court has personal jurisdiction over Counterclaim-Defendant Comedy Partners because Comedy Partners is principally located in the State of New York and regularly does business in the State of New York and/or by virtue of Comedy Partners' significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

27.     This Court has personal jurisdiction over Counterclaim-Defendant BET Holdings LLC because BET Holdings LLC regularly does business in the State of New York and/or by virtue of BET Holdings LLC's significant contacts with the State of New York relating to the Viacom Affiliation Agreements.  Furthermore, upon information and belief, one or more members of the limited liability company include entities organized under the laws of New York and/or with their principal place of business in New York.

28.     This Court has personal jurisdiction over Counterclaim-Defendant Country Music Television, Inc. because, under Country Music Television, Inc.'s agreement with TWC, the parties agreed to consent to personal jurisdiction in the State of New York for any proceeding

arising out of or relating to the agreement between the parties.  CMT Agreement § 19(c) (Jan. 1, 1999).  Furthermore, this Court has personal jurisdiction over Country Music Television, Inc. because Country Music Television, Inc. regularly does business in the State of New York and/or by virtue of Country Music Television, Inc.'s significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

29.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(a).

## FACTUAL BACKGROUND

*The Viacom Affiliation Agreements*

30.    Counterclaim-Plaintiff TWC is the second largest cable operator in the United States, with technologically advanced systems located mainly in five geographic areas:  New York State (including New York City), the Carolinas, Southern California (including Los Angeles), Ohio and Texas.  As of June 30, 2010, TWC served more than 14.4 million customers who subscribe to one or more of its video, high-speed data, and voice services.

31.    Viacom is a global entertainment content company, providing television programming, motion pictures, and a wide range of digital media.  Viacom's television business is organized into the MTV Networks ("MTVN") and the BET Networks ("BETN") divisions. BETN provides the *BET* and *Centric* channels.  MTVN provides various cable networks, including *MTV, VH1, Nickelodeon, Nick at Nite, Comedy Central, CMT, Spike, TV Land,* and *Logo*.

32.    The Counterclaim-Plaintiffs' rights to distribute the Viacom Services, among other Viacom networks, are set forth in agreements known in the industry as carriage or affiliation agreements.  Specifically, the Counterclaim-Plaintiffs' rights to distribute the Viacom Services are set forth in a series of interrelated agreements (together the "Viacom Affiliation Agreements"), which for the purposes herein, include:

(i) the agreement captioned "Affiliation Agreement" between MTVN and TWC, dated as of August 10, 2000, regarding distribution of *Nickelodeon, MTV, VH1* and *Spike* (the "Core Services Agreement");

(ii) the agreement captioned "Affiliation Agreement Comedy Central" among MTVN, Comedy Partners, and TWC, dated as of April 21, 2003, regarding distribution of *Comedy Central* (the "Comedy Agreement");

(iii) the agreement captioned "Black Entertainment Television Affiliation Agreement" between Black Entertainment Television, Inc. and TWC, dated as of November 1, 1995, regarding distribution of *BET*, and amendments thereto (the "BET Agreement");

(iv) the agreement captioned "Country Music Television Affiliation Agreement" between Country Music Television, Inc. and TWC, dated as of January 1, 1999, regarding distribution of *CMT* (the "CMT Agreement");

(v) the letter agreement between MTVN and TWC, dated as of November 9, 2004, amending the Core Services Agreement (the "First Amendment Core Services Agreement");

(vi) the letter agreement between MTV and TWC, dated as of January 1, 2006, amending and extending the term of the Core Services Agreement ("Second Amendment Core Services Agreement");

(vii) the term sheet captioned "Time Warner Cable/MTV Networks/BET Networks Term Sheet," dated as of January 1, 2009 (the "TWC/MTVN/BETN Term Sheet"); and

(viii) the letter agreement captioned "HD Simulcast Amendment," dated as of December 4, 2009 (the "HD Simulcast Amendment").

33.    The Viacom Affiliation Agreements constitute the binding agreements between the Counterclaim-Plaintiffs and the Counterclaim-Defendants, as the parties specifically agreed that the Viacom Affiliation Agreements constitute the entire agreement between the parties with respect to the respective Viacom Services governed by those agreements. See Core Services Agreement § 16(c) (Aug. 10, 2000); see also Comedy Agreement § 15(c) (Apr. 21, 2003); BET Agreement § 11(d) (Nov. 1, 1995); CMT Agreement § 22 (Jan. 1, 1999).

34.    TWC has distributed the Viacom Services to its video subscribers pursuant to the Viacom Affiliation Agreements and has remitted over a billion dollars in fees to the

Counterclaim-Defendants on the basis of the payment terms set forth in the Viacom Affiliation Agreements.

35.    The Viacom Affiliation Agreements broadly provide for TWC to distribute the Viacom Services through TWC's cable systems.  See Core Services Agreement § 2(a) (Aug. 10, 2000) (████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████); see also Comedy Agreement § 2(a) (Apr. 21, 2003); BET Agreement § 1(a) (Nov. 1, 1995); CMT Agreement § 1(a) (Jan. 1, 1999).  Moreover, TWC has been granted broad rights with respect to the high definition feeds of each of the Viacom Services, which are the specific feeds used in connection with the delivery of video programming for in-home iPad viewing.  See HD Simulcast Amendment § 1 (Dec. 4, 2009) (████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████).

36.    The devices subscribers use to view television in the home continually change and have evolved over time from analog vacuum tube devices to flat screen displays – both plasma and LCD's -- and now Smart TV's, iPads and other tablets.

37.    The Counterclaim-Plaintiffs' agreements with the Counterclaim-Defendants do not place restrictions on the types of devices that subscribers can use to view programming

distributed on TWC's cable system in their homes.  Nothing in the Viacom Affiliation

Agreements places any restriction on TWC's distribution of the identified Viacom Services via

TWC's private cable system to video subscribers in their homes, or on the type or number of

devices that may be used by TWC video subscribers to receive the Viacom Services over TWC's

cable system.  Nowhere in the Viacom Affiliation Agreements is TWC required to deliver the

Viacom Services only to set-top boxes.

*TWC's "Broadband TV" Service in San Diego*

38.    On or about July 8, 2005, TWC launched a service in San Diego that involved

delivery of licensed content using the IP format to computers in the homes of TWC's video

subscribers.  The service was called "Broadband TV."  The trade and local press widely covered

the launch of Broadband TV.

39.    In-home iPad viewing is nothing more than a version of Broadband TV.  With

Broadband TV, the video programming, which included many of the Viacom Services, was

converted to IP format, was delivered in IP format using TWC's existing cable systems to video

subscribers only, and was distributed only to the subscribers' homes.  The same is true of the

TWCable TV iPad App.  With Broadband TV, the Viacom Services could be delivered to

laptops and desktop computers, such that the subscriber could use an in-home wireless network

in connection with accessing the video programming.

40.    By letter dated July 20, 2005, Viacom expressed purported concerns about

Broadband TV, stating that "[i]t has come to our attention through press reports that [TWC] has

launched a version of Internet-protocol TV which offers video and high-speed Internet

subscribers the ability to view certain program services over the Internet on their computers [and

that] such Internet distribution is in violation of the Affiliation Agreement between TWC and

MTVN dated as of August 10, 2000, as amended."

41.    By letter dated July 22, 2005, TWC responded that Broadband TV "is being offered over our cable system, not on the Internet and is being provided solely to TWC expanded basic customers, who already receive those same programming services [and that the] service simply provides a simulcast of the expanded basic tier for which TWC San Diego customers already pay in another technical format."

42.    After TWC's explanation, which applies equally to in-home iPad viewing, Viacom raised no further concerns with TWC, and Broadband TV continued under the existing agreements with Viacom until January 2007, when TWC decided to discontinue Broadband TV. As discussed above, the Counterclaim-Plaintiffs and the Counterclaim-Defendants amended their various agreements multiple times after their July 2005 exchange of letters.  In fact, during the very period in which TWC offered Broadband TV (i.e., July 2005 through January 2007), the parties negotiated the Second Amendment Core Services Agreement which extended the term of the Core Services Agreement from ███████████ through ███████████.  In none of those negotiations did any of the Counterclaim-Defendants ever seek to limit the scope of the Counterclaim-Plaintiffs' grant of rights, which are the same grant of rights at issue here.  None of the subsequent amendments expressly addressed Broadband TV or related issues.

43.    In reliance on the breadth of the grant of rights in the Viacom Affiliation Agreements and in part, upon the Counterclaim-Defendants' acquiescence in TWC's Broadband TV service in San Diego, TWC continued to develop new technological options that would enable its video subscribers to view its video programming on different video display devices within the home.

*In-Home iPad Viewing*

44.    In late 2010, TWC began to preview its development of the TWCable TV iPad App to enable in-home iPad viewing.  Glenn Britt, the Chairman and CEO of TWC, announced on

December 6, 2010 at the UBS Global Media and Communications Conference that TWC was "working on [] an app that will stream our video service to the iPad. So if you want to use that as a TV screen in your home, you can."

45. In January 2011, at the Consumer Electronics Show in Las Vegas, Nevada, TWC provided a public demonstration of what would become in-home iPad viewing using a tablet device from another consumer electronics manufacturer.

46. These events were well-publicized and attended by a wide range of communications executives. TWC received numerous inquiries from the public and other programmers about these services. TWC's presentation at the Consumer Electronics Show was also made available on the Internet.

47. On March 15, 2011, TWC launched the TWCable TV iPad App, making cable television programming viewable by its video subscribers on their Apple iPads. Specifically, subscribers to TWC's cable services now have the option to view on their iPad, within their homes, channels to which they have access through their TWC cable system and subscription.

48. The technology for distributing video programming to cable television subscribers is constantly evolving. Indeed, TWC has long employed a variety of formats to distribute video programming over its "pipes" and into the home in order to optimize the video feed for the particular devices used by its subscribers.

49. The distribution of video programming to the subscriber's cable modem for in-home iPad viewing is functionally equivalent to the distribution of video programming to a TWC subscriber's set-top box for viewing on any other display device. The technology underlying the iPad distribution merely reflects another way in which TWC reformats the programming signals within its cable system, as it regularly does with respect to all types of video programming. In

fact, in the Viacom Affiliation Agreements, the Counterclaim-Plaintiffs and the Counterclaim-Defendants specifically contemplated that the cable that comes out of a subscriber's wall could plug into devices other than a set-top box connected to a television, such as a cable modem in this case.  See Second Amendment Core Services Agreement § 2(a) (Jan. 1, 2006) (████████ ███████████████████████████████████████████████); see also First Amendment Core Services Agreement § 1 (Nov. 9, 2004) (████████████████ ██████████████████████████).

50.     TWC video subscribers do *not* need to subscribe to TWC's High Speed Data Internet service in order to utilize the iPad App.  To the contrary, any TWC video subscriber (even if they receive Internet service from a non-TWC provider) may download and utilize the iPad App.  Such "video-only" subscribers need only request deployment of a TWC cable modem in their homes, which will receive the iPad App signal and authenticate the user as a TWC video customer.  In such cases, the TWC modem (which is supplied at no additional cost) is used solely for receiving the iPad App signal and transmitting it to the iPad, not for receiving Internet service.  Such video-only subscribers may obtain Internet services from any provider they choose.

51.     In distribution of video programming both to set-top boxes and to iPads, the video programming signal is received via satellite from the programmer, converted by TWC into digital formats that are compatible with TWC's cable systems, transmitted in IP format to TWC's distribution hubs, and delivered into the subscriber's home through TWC's hybrid fiber-coaxial (HFC) network – all through TWC's cable systems.

52.     Specifically, TWC provides video programming to its subscribers predominantly in the following manner:  network programmers deliver digital feeds via satellite to an Integrated

Receiver/Decoder (IRD) located at a TWC facility.  TWC usually receives this satellite feed

either in MPEG-2 or MPEG-4 format.  The feed is then transmitted to an encoder via Serial

Digital Interface (SDI), Asynchronous Serial Interface (ASI) or Ethernet.  A video re-encode

process is employed to convert all signals to an MPEG-2 format and optimize it for distribution

to the set-top box.  The feed is then wrapped into an MPEG-2 transport stream, and transmitted

to the TWC distribution hubs in IP format.  It is then transmitted to TWC's subscribers across

TWC-controlled cable systems and is ultimately delivered into the TWC video subscriber's

home through a coaxial cable.

53.   The distribution of video programming to the subscriber's cable modem for in-

home iPad viewing utilizes essentially the same process, except the video is re-encoded into

H.264/MPEG-4 format and transmitted using HTTP Live Streaming (HLS) transport protocol,

which is another IP transport format.

54.   Once TWC's HFC cables enter the TWC video subscriber's home, one feed enters

a video subscriber's set-top box or other device set up to receive the signal, and another enters

the video subscriber's cable modem.  As noted, the video subscriber does not need to be a

subscriber to TWC's High Speed Data Internet service in order to receive and utilize the iPad

App signal.  The video subscriber's cable modem receives a quadrature amplitude modulation

("QAM") modulated radio frequency signal containing encapsulated IP packets and redistributes

those IP packets to a variety of home networks, including, for example, Ethernet and WiFi

networks commonly used to render the programming on certain consumer electronic video

display devices, including the iPad.  Indeed, such modems are now being built into set-top boxes

directly.  Both set-top boxes and modems serve similar functions with regard to these feeds, such

as by ensuring that the feed is securely transmitted to the viewing device (e.g., a television, an

iPad, or another display device) and ensuring that the customer is authorized to receive the channels.

55.    The video programming that is distributed via cable modem to a TWC video subscriber's iPad for in-home iPad viewing is never transmitted over the public Internet.  The video programming is instead transmitted through TWC's proprietary, purpose-built cable system – whether delivered to an iPad, a set-top box, a personal computer with a cable card, or any of the many other devices a TWC video subscriber may have in the home that are capable of receiving the feed.

56.    In order to view any of the networks on the iPad, TWC video subscribers must first download the TWCable TV iPad App from Apple's iTunes App Store and go through a series of authentication steps to ensure that the subscribers are in fact TWC video subscribers and that they are accessing the video programming from within their homes.

57.    To enable in-home iPad viewing, TWC employs a number of authentication measures to ensure that the TWCable TV iPad App will function only over the TWC cable systems.  Through these procedures, TWC confirms that the iPad is connected through an address authorized to operate on the TWC network, and that the subscriber is connected through his or her home cable modem, and requires that subscribers utilize passwords that verify they are TWC customers.  In-home iPad viewing is limited to those channels to which the subscriber is entitled under the terms of his or her TWC subscription.  Additionally, TWC's subscriber agreement requires its customers to encrypt the wireless routers they use to receive the signal on their iPads.

58.    None of the video programming distributed for in-home iPad viewing is stored on the iPad.

59.     Thus, just as TWC employs tight security measures in connection with set-top boxes to ensure that its programming is viewed only by authorized subscribers, it employs security measures for iPad viewers that provide comparable protection.  TWC takes these substantial security measures, and more, to prevent unauthorized access to the video programming and to ensure that all of the users of the TWCable TV iPad App are paying for any channel that they watch.

60.     TWC's provision of its application for in-home iPad viewing is merely an enhancement of features and transport that it otherwise employs in connection with the delivery of its cable services to its existing subscribers.  Enabling in-home iPad viewing is not the same as providing a broadband data or cable modem service.  The programming is not viewed over the public Internet.  It is just the same programming being distributed over the cable system onto a different screen within the home.

*In-Home iPad Viewing Is Very Popular Among TWC Video Subscribers*

61.     The TWCable TV iPad App experienced high consumer demand on the first day of its release, ranking as the most frequently downloaded free "app" in Apple's iTunes App Store. This interest demonstrated clearly to TWC that its subscribers wanted to use their iPad as a viewing device in their homes.

62.     Between March 15, 2011 and June 5, 2011, the TWCable TV iPad Apps had been downloaded over 500,000 times.

*Viacom's Cease and Desist Request*

63.     On March 15, 2011, after Viacom had been informed that the iPad App had been launched, counsel for Viacom Inc., Peter Zimroth of Arnold & Porter LLP, sent a cease and desist letter to Marc Lawrence-Apfelbaum, EVP and General Counsel, TWC, claiming that "Viacom would consider any launch of an iPad application using its copyrighted content as a

serious and material breach of the Affiliation Agreement and an infringement of its exclusive rights under copyright law."

64.    TWC responded by letter to Viacom's counsel on March 16, 2011, vigorously denying any wrongdoing and explaining to Viacom's counsel why Viacom's legal and factual position was baseless.  TWC has at all times acted within its contractual rights under the Viacom Affiliation Agreements, and the Counterclaim-Defendants have not and cannot identify any contractual provision of the Viacom Affiliation Agreements that are violated by TWC subscribers' use of in-home iPad viewing.

65.    The programming networks made available to subscribers for in-home iPad viewing on March 15, 2011, included *BET, CMT, Comedy Central, MTV, Nickelodeon, Spike*, and *VH1*.

66.    On March 31, 2011, TWC removed the Viacom Services from the programming that it offers to its subscribers for in-home iPad viewing and added other programming from cable networks that had not objected to iPad viewing of their programming.  Currently, programming from 81 services is being transmitted to the iPad App.

### DISH Network Already Displays Viacom Programming on iPads

67.    By seeking to restrict TWC's ability to provide the Viacom Services to its paying subscribers through their iPad devices within their own homes, the Counterclaim-Defendants have put TWC at a competitive disadvantage vis-à-vis other multichannel video programming distributors of the Viacom Services.

68.    For example, DISH Network, one of the two largest satellite television providers that competes with TWC, has launched a similar service permitting delivery not only to an iPad but to almost any Internet-connected device, both inside and outside of the home.  See Press Release, DISH Network, *DISH Network is First Pay-TV Provider to Give Customers Ability to*

*Watch Their Live TV on iPad* (Dec. 1, 2010).  Thus, unlike TWC, DISH Network offers its customers equipment that allows video programming to be viewed both in the home on a variety of devices, and also remotely over the public Internet.

69.     Upon information and belief, the Counterclaim-Defendants have not provided DISH with any special license allowing inside or outside-the-home distribution.  Nor have the Counterclaim-Defendants taken any action to prevent DISH Network from displaying the Viacom Services on iPads or any other device inside or outside of the home.

*Smart TV's and Other Video Display Device Applications for Subscribers*

70.     The Counterclaim-Defendants' refusal to abide by the grant of rights in the Viacom Affiliation Agreements has far broader implications than viewing over iPads.  TWC will shortly enable other devices utilizing its cable system to view video programming.  For example, television manufacturers are now introducing a next generation of Smart TV's, and TWC is in the process of finalizing an application for its subscribers to view programming on Smart TV's. There is no fundamental difference between the way TWC will distribute video programming over its cable system to iPads, Smart TV's, or other viewing screens.

71.     Unlike the case with iPads, however, TWC's customers would be able to view TWC's services on Smart TV's through set-top boxes in addition to cable modems.  The principal benefit to TWC and its customers from using the IP format to serve these devices is that it will eliminate the need for customers to lease set-top boxes from TWC, thereby saving them money and making viewing more convenient.  Finding alternatives to set-top boxes has been a policy priority for the Federal Communications Commission ("FCC"), and TWC and other multichannel video programming distributors have been working to support the policy and provide additional convenience for its customers.  See, e.g., *In re Video Device Competition*, Notice of Inquiry, 25 F.C.C. Rcd. 4275 (April 21, 2010).

72.     TWC is fully authorized under the Viacom Affiliation Agreements to develop and launch an application for Smart TV's, as well as other comparable devices in the future, without having to seek consent from, or pay additional carriage fees to, the Counterclaim-Defendants.

## COUNT ONE

### (Declaratory Judgment – In-home iPad Viewing and Other Subscriber Viewing Applications)

73.     The Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 72, as if fully set forth herein.

74.     Under the terms of the Viacom Affiliation Agreements, the Counterclaim-Plaintiffs are authorized to distribute the Viacom Services to TWC video subscribers via its cable system so that subscribers can watch the Viacom Services on video display devices of their choice, including their iPads, regardless of the transmission technology, using applications provided by TWC.

75.     The Counterclaim-Defendants are not entitled unilaterally to alter any terms of the Viacom Affiliation Agreements and have no basis under the Viacom Affiliation Agreements upon which to object to subscriber use of different video display devices, such as iPads or "Smart TV's," to view video programming distributed by TWC over its cable system.  There are no limitations under the grant of rights in the Viacom Affiliation Agreements restricting the video display devices, whether televisions, iPads, or Smart TV's, that TWC video subscribers may utilize to watch programming distributed over the TWC cable system.

76.     The Counterclaim-Defendants have demanded that TWC cease and desist from the distribution of the Viacom Services through the TWCable TV iPad App, which utilizes the same TWC cable system through which other TWC services are provided, and have brought this action seeking damages and injunctive relief.

77.    The dispute between the parties is ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties, so as to prevent harm to the Counterclaim-Plaintiffs.  There is no adequate alternative remedy.

## COUNT TWO

### (Declaratory Judgment -- Non-Infringement of Copyrights)

78.    The Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77, as if fully set forth herein.

79.    In the Viacom Affiliation Agreements, the Counterclaim-Defendants have granted the Counterclaim-Plaintiffs a broad license for the Counterclaim-Plaintiffs to distribute the Viacom Services through TWC's cable systems.

80.    Under the Viacom Affiliation Agreements, the Counterclaim-Plaintiffs are authorized to launch the TWCable TV iPad App to enable subscribers to engage in in-home iPad viewing of the Viacom Services.

81.    As a licensee acting lawfully within its rights under license agreements granted by the Counterclaim-Defendants, the Counterclaim-Plaintiffs did not infringe any copyrights held by the Counterclaim-Defendants during the two-week period in which TWC enabled certain subscribers to view the Viacom Services on iPads in their homes.

82.    The dispute between the parties is ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties, so as to prevent harm to the Counterclaim-Plaintiffs.  There is no adequate alternative remedy.

WHEREFORE, the Counterclaim-Plaintiffs respectfully request that the Court:

1.    Declare that, under the grant of rights in the Viacom Affiliation Agreements, the Counterclaim-Plaintiffs are authorized to provide services to TWC video subscribers, including through the TWCable TV iPad App, a "Smart TV" application, and other comparable

applications and services, that enable subscribers to view video programming distributed on TWC's cable systems on a video display device of their choice in the home;

   2. Declare that the Counterclaim-Plaintiffs, as licensees acting lawfully within the grant of rights under the Viacom Affiliation Agreements, are not infringing any copyrights held by the Counterclaim-Defendants, by providing services to its subscribers, including through the TWCable TV iPad App, a "Smart TV" application, and other comparable applications and services, that enable subscribers to view video programming distributed on TWC's cable system on a video display device of their choice in the home;

   3. Award the Counterclaim-Plaintiffs costs, attorneys' fees, and such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
      June 6, 2011

        CAHILL GORDON & REINDEL LLP

       By: _____
         Jonathan D. Thier (jthier@cahill.com)
         Brian T. Markley (bmarkley@cahill.com)
         Kayvan B. Sadeghi (ksadeghi@cahill.com)
         80 Pine Street
         New York, NY 10005-1702
         Telephone:  (212) 701-3000
         Fax: (212) 269-5420

         Attorneys for Defendants and Counterclaim-Plaintiffs